**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C. MYERS, guardian ad litem;
L.M., a minor,
        *Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,
        *Defendant-Appellee.*

No. 09-56092

D.C. No.
3:02-cv-01349-
BEN-AJB

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
June 10, 2010—Pasadena, California

Filed July 15, 2011

Before: Alex Kozinski, Chief Judge, Johnnie B. Rawlinson,
Circuit Judge, and Mark W. Bennett, District Judge.*

Opinion by Judge Bennett;
Partial Concurrence and Partial Dissent by Judge Rawlinson

---

*The Honorable Mark W. Bennett, District Judge for the Northern District of Iowa, sitting by designation.

9599

## COUNSEL

Stephen T. Cox, Cox and Moyer, Pebble Beach, California, and Scott J. Allen, LaRiviere, Grubman & Payne, L.L.P., Monterey, California, for the plaintiff-Appellant.

Karen P. Hewitt, United States Attorney, S.D. Cal., San Diego, California; Tony West, AAG Civil Div.; J. Patrick Glynn, Dir., Torts Branch; Adam Bain, Sr. Trial Counsel, Torts Branch; Kirsten L. Wilkerson, Charles A. Quinlan III, John J. Schoemehl, Trial Attorneys, Torts Branch, Washington, D.C., for the defendant-appellee.

## OPINION

BENNETT, District Judge:

Plaintiffs seek damages from the United States for injuries to a child allegedly caused by exposure to the toxic heavy metal thallium from soil dumped into a landfill adjacent to the child's residence and school. The child, by her guardian ad litem, appeals a decision of the district court finding that the United States acted "reasonably" and did not breach any duty in conducting the soil remediation project. The district court also found that it did not have subject matter jurisdiction, because the "discretionary function" exception to tort liability of the United States applies in this case. We reverse and remand for further proceedings.

## I.  BACKGROUND

### A.  Factual Background

Whether or not the district court's findings of fact are
clearly erroneous depends upon "the entire evidence" in the
record. *See United States v. Hinkson*, 585 F.3d 1247, 1260
(9th Cir. 2009) (*en banc*). Therefore, this statement of the fac-
tual background identifies both the district court's findings
and other evidence in the record that is relevant to the review
of the district court's findings.

As the district court found, in 1989, the Environmental Pro-
tection Agency (EPA) placed the United States Marine Corps
Base at Camp Pendelton on the "National Priorities List" of
sites requiring environmental cleanup. The Department of the
Navy entered into a comprehensive environmental cleanup
plan for Camp Pendleton, known as a Federal Facility Agree-
ment (FFA), with the concurrence of the EPA, the California
Department of Toxic Substances Control (DTSC), and the
San Diego Regional Water Quality Control Board (RWQCB).

Although the district court did not refer to such a provision
in its findings, the FFA required, among other things, that the
Navy,[1] as the party responsible for the cleanup, designate a
Quality Assurance Officer (QAO) as follows:

> 20.1 In order to provide quality assurance and
> maintain quality control regarding all field work and
> sample collection performed pursuant to this Agree-
> ment, the Marine Corps agrees to designate a Quality
> Control Officer (QAO) who will ensure that all work
> is performed in accordance with approved work

---

[1]Unless specific circumstances require otherwise, this opinion refers to
the Navy, the United States Marine Corps, which is part of the Navy, and
the United States, the defendant-appellee in this action, collectively as "the
Navy."

plans, sampling plans and QAPPS [Quality Assurance Project Plans]. The QAO shall maintain for inspection a log of quality assurance field activities and provide a copy to the Parties upon request.

FFA, ¶ 20.1. The district court did not note in its findings that the Naval Facilities Engineering Command (NAVFACENG-COM) also uses a Safety and Health Program Manual (the Manual) for all environmental cleanup operations. The Manual specified, in pertinent part, that "[e]ach NAVFACENG-COM activity shall ensure that plans are reviewed and accepted prior to issuing the Notice to Proceed." Manual, ¶ 0407.b. The Manual also provided as follows:

> c. *Reviews*. All HASPs [(health and safety plans)] shall be reviewed prior to initiating site work by a competent person. Competent person shall mean a certified industrial hygienist [(CIH)] or equivalent by training and/or experience. In addition, an EFD/EFA Construction Safety Manager or designated representative who has sufficient knowledge and authority to review and accept construction safety procedures shall review HASPs for construction safety requirements.

Manual, ¶ 0407.c.

Sites at Camp Pendelton requiring cleanup were divided into "operable units." "Operable Unit 3" (OU-3) consisted of five contaminated areas where wastes had been burned. Tests of the soil in all five areas indicated contamination with toxic substances, but two, known as Sites 1A and 2A, showed elevated levels of thallium.[2] As to the sites showing elevated levels of thallium, the district court found as follows:

---

[2]There is no question that thallium is highly toxic. According to a World Health Organization report from 1996, cited in the record, no study has determined a "no-observed-effect level" for exposure to thallium.

Of the 154 samples [taken at Site 1A], only one sample exceeded the safe standard for thallium—and not by much. At Site 2A, 99 soil samples were taken. . . . Of the samples, only two samples exceed[ed] the safe standard for thallium. One sample was only a little high. The other sample was high, but appeared to be an unreliable test result. The Defendant's contractor used the Inductively Couple Plasma—Atomic Emission Spectroscopy method to identify thallium in the soil samples. That method sometimes produces false positives where there are metals in the sample. In the soil at site 2A, there were high concentrations of other metals such as zinc and manganese, which likely caused the false positive test for thallium. Lead was much more prevalent than thallium in the soil moved to Box Canyon and was considered to be the primary risk to human health.

Although the district court found that lead was the primary risk to human health, the Navy's "Record of Decision" (ROD), which set forth its plan to clean up or "remediate" the sites in OU-3, actually states, "[t]he primary contributors to the HI [hazard index] [for Site 1A] are arsenic, copper." Lead is not mentioned in that list, although concentrations of lead above established safety levels were also noted. Similarly, the ROD actually states, "The primary hazard contributors [for

_____

World Health Organization, Environmental Health Criteria 182: Thallium 204-05 (1996). Thallium is designated a "toxic pollutant" pursuant to § 307(a)(1) of the Clean Water Act, 40 C.F.R. § 401.15; 33 U.S.C. § 1317(a), and is, therefore, designated a CERCLA "hazardous substance" under 42 U.S.C. § 9601(14). Interestingly, Wikipedia notes, "Because of its use for murder, thallium has gained the nicknames 'The Poisoner's Poison' and 'Inheritance Powder' (alongside arsenic)." http://en.wikipedia.org/wiki/Thallium. It is not surprising, therefore, that thallium has been the weapon of choice for various fictional murderers. *See, e.g.,* Agatha Christie, The Pale Horse (1961); Nigel Williams, The Wimbledon Poisoner (1990); CSI: NY, "Page Turner" (first aired Oct. 1, 2008).

Site 2A] are manganese, thallium, and zinc." Again, lead is not mentioned in that list, although concentrations of lead above established safety levels were again noted.

The HI for both Site 1A and Site 2A indicated that there was a potentially "unacceptable" risk to human health requiring cleanup. However, the district court found that the thallium at these sites was believed to be in low concentrations in the contaminated soil.

The Navy's plan to clean up or "remediate" the sites in OU-3 involved excavation of contaminated soils from the OU-3 sites, transportation of those soils across the base by dump truck, and dumping of those soils into a landfill known as Box Canyon Landfill or Site 7. The Box Canyon Landfill was adjacent to the Wire Mountain Family Housing area of the Marine Corps base at Camp Pendelton and near an elementary school.

The Navy contracted with IT/OHM to perform much of the work on the OU-3 project. The Navy's contract with IT/OHM required IT/OHM to prepare a HASP (referred to in the contract as a "Site Health and Safety Plan" or SHSP), and IT/OHM did so. Under the HASP, IT/OHM's industrial hygienist (or "Health and Safety Officer") had on-site responsibility and authority to modify or stop work if working conditions presented a risk to health and safety. The HASP included requirements for monitoring ambient air and airborne contaminants, including levels for "total dust" that should have required work stoppages. If dust levels from monitors placed near the housing area or the school exceeded a certain level, then the contractor was to determine the source of the dust, increase the dust control efforts in the landfill, and if increased dust control measures were "ineffective," stop soil moving activities in the landfill. The district court found that the air monitors employed by IT/OHM were appropriate for the task. However, the district court failed to note that the air monitoring device specified did not monitor "total

dust," but only dust particles smaller than a certain size. In addition to air monitoring requirements, the HASP required wetting of newly dumped soil to suppress dust and covering of contaminated soil with layers of uncontaminated soil.

The Manual, ¶ 0407.c, required the Navy to approve the HASP before work was to begin. Nevertheless, there is no evidence that either of the Navy's CIHs ever approved the HASP for the OU-3 project. One of the Navy's CIHs, Janet Corbett, testified that she did not review the HASP. The Navy's other CIH, Andrew Bryson, testified that he had no record showing that he had reviewed the HASP for the OU-3 project and that he did not recall doing so.

During the summer and early fall of 1999, in the course of executing the OU-3 soil remediation plan, 240,000 cubic yards of contaminated soil from four polluted sites were transported to and disposed of in the Box Canyon Landfill, including soil from the two sites contaminated with thallium. During the project, Navy personnel monitoring the project met regularly with personnel from IT/OHM. The district court found that there were "occasions" in the course of the project when the air monitoring equipment registered dust levels in excess of the levels that were supposed to require work stoppages (called "exceedences" by the parties), but did not note that record evidence showed that such exceedences occurred more than 200 times. The district court found that action levels were set so low that there "were exceedences where there was no visible dust." It is undisputed that the work was never stopped because of these exceedences. The district court did not find, but the undisputed record evidence shows, that the Navy's QAO for the project, Nars Ancog, never looked at the air monitoring data collected by IT/OHM, nor did anyone else from the Navy. Residents in the nearby Wire Mountain Family Housing area testified that, at times during the remediation project in 1999, visible clouds of dust blew from the landfill. The district court found that "[a]ny visible dust was likely from uncontaminated soil."

Myers's house in the family housing area of Camp Pendelton was adjacent to the Box Canyon Landfill. Indeed, the fence line for and access road to the landfill were only about 50 feet from her backyard, where Myers often played. The landfill was also only about 200 feet from an elementary school, where Myers played and later attended school. Soon after the dumping of contaminated soil into the adjacent landfill, Myers became ill. She suffered, and she continues to suffer, from gastrointestinal distress, peripheral neuropathy (a kind of nerve damage), cognitive deficits, and alopecia (loss of body hair), all of which are known side-effects of exposure to thallium.

Some analyses of Myers's urine in March 2000 indicated concentrations of thallium well in excess of (as much as ten times) those expected in the urine of persons who had not been exposed to thallium. Subsequent tests purportedly showed no concentrations of thallium in excess of those expected in a non-exposed person. The raw data for those later tests was destroyed after this litigation commenced, however, so that there is no way to determine the reliability of those tests. The district court described the evidence about whether Myers's urine samples revealed normal thallium levels for humans as "mixed." District Court Decision at 8. The district court found that, even if one assumed that exposure to thallium caused Myers's medical condition, it was not obvious how or when she was exposed to the toxic metal.

The Navy or its contractors collected post-project samples in 2000, consisting of over 100 site soil samples, 30 wipe or "swipe" (dust) samples, ten bulk samples, and even hair samples from Myers's dog. Consistent with the district court's findings, the Navy asserts that only one of these samples, taken from the elementary school, showed thallium, but the level shown was actually below the naturally-occurring background level. In contrast, Myers asserts that these samples were taken months after the end of the OU-3 project and after an intervening winter of wind and rain. She also contends

that, contrary to the Navy's assertion, while the final report of sampling showed results of less than one microgram of thallium in some of the samples (identified as a "non-detect"), the raw data actually indicated results that exceeded one microgram, the detection limit used for the tests, so that they should have been construed as "positives." Myers also contends that her expert's review of the raw data and actual test results indicated that eight wipe or "swipe" samples from air conditioning ducts in Myers's house and other adjacent houses were positive for thallium.

## B. *Procedural Background*

On July 10, 2002, Myers's guardian ad litem filed suit pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, against the United States, as the appropriate party in a FTCA case for claims against the Navy.[3] Myers's claims were for negligence, nuisance, trespass, strict liability for ultra-hazardous activity, and battery. The trial judge trifurcated the bench trial into "breach of duty," "actual and proximate causation," and "damages" phases.

During the first phase of the trial, Myers presented evidence in support of her allegations that the Navy breached its duty of care in the following ways: (1) the Navy violated its own established policies set forth in the Manual by failing to have a CIH review the HASP for the Camp Pendleton project before the work of disposing of contaminated soils in the landfill began; and (2) the Navy's designated QAO acted negligently by failing to oversee the air (dust) monitoring plan carried out by IT/OHM. Post-trial briefs were submitted in May 2006. The case then languished for the next three years.

---

[3]Myers's suit also included state tort law claims against IT/OHM and another contractor, the Shaw Group. The Shaw Group filed a suggestion of bankruptcy and was dismissed. IT/OHM eventually settled the claims against it and was also dismissed.

When the district court finally entered its Decision with Findings of Fact and Conclusions of Law (Decision) on the first phase of the bench trial, it offered no explanation for the long delay. The Decision did, however, state that the court found "that the Government did act reasonably," leading the court to find in favor of the Navy and against the plaintiff. In reaching this conclusion, however, the district court relied, in part, on the determination of a "causation" issue—whether Myers *was* exposed to thallium from the OU-3 project, a question on which Myers had not been fully heard—in what was supposed to be the "breach of duty" phase of the trial. The Decision also stated that, "[m]oreover, Defendant's actions fall within the discretionary function exception." This ruling was a reversal, without explanation, of the district court's denial of the Navy's motion to dismiss, which had raised the "discretionary function" exception as a bar to Myers's suit. The district court's Decision on phase one of the bench trial obviated the need for phases two and three.

This appeal followed.

## II.   LEGAL ANALYSIS

This appeal presents two primary issues: (1) Did the district court commit reversible error in finding that Myers's claims were barred by the "discretionary function" exception? and (2) Did the district court commit reversible error in finding that the United States acted "reasonably" in fulfilling its duty to ensure that IT/OHM used proper safety precautions during the soil remediation project?

### A.   Applicability Of The "Discretionary Function" Exception

#### 1.   Standard of review

We review *de novo* the dismissal of a FTCA suit for lack of subject matter jurisdiction under the "discretionary func-

tion" exception. *See Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). We review determinations of underlying facts for clear error. *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005).

### 2.    The "discretionary function" exception

**[1]** The FTCA waives the government's sovereign immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment. Among the exceptions to that waiver is the "discretionary function exception," which provides immunity from suit for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The "discretionary function" exception insulates certain governmental decision-making from " 'judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Terbush*, 516 F.3d at 1129 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). "The government bears the burden of proving that the discretionary function exception applies." *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002); *see also Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (same).

The two-prong test to determine the applicability of the exception requires the court to determine (1) whether challenged actions involve an element of judgment or choice; and (2) if a specific course of action is *not* specified, whether the discretion left to the government is of the kind that the discretionary function exception was designed to shield, namely, actions and decisions based on considerations of public policy. *Terbush*, 516 F.3d at 1129 (citing *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)). The first-prong inquiry

"looks at the 'nature of the conduct, rather than the status of the actor' and the discretionary element is not met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.' " *Id.* (quoting *Berkovitz*, 486 U.S. at 536). "If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive.' " *Id.* On the other hand, if there is no statute or policy directing mandatory and specific action, the court must continue to the second prong of the analysis. *Id.* The second prong requires the court to determine whether the discretion left to the government is the kind of discretion protected by "public policy," which is "understood to include decisions grounded in social, economic, or political policy." *Id.* (internal quotation marks omitted). "Even if the decision is an abuse of the discretion granted, the exception will apply." *Id.*

### 3. Analysis

#### a. Direction of "mandatory and specific" action

Myers argues that there are two sources of mandatory and specific action in this case: The Manual provision requiring the Navy to review HASPs and the FFA provision requiring the project QAO to ensure that all work is performed in accordance with approved work plans, sampling plans, and QAPPS. The Navy argues that neither source imposed sufficiently specific requirements to divest the Navy of its discretion.

*i. Manual provisions.* On appeal, Myers asserts that the Manual required that the HASP be reviewed by *the Navy's* CIH or similar competent person, not just by an employee of the contractor. The Navy argues that the provision of the Manual on which Myers relies does not specify how any review of the HASP was to be conducted and was not specific enough to remove discretion. The Navy also contends that the

HASP was reviewed by the contractor's CIH. The district court made no findings on this issue.

[2] The relevant provision in the Manual, ¶ 0407.c, uses the unambiguously mandatory "shall" in stating the requirement for review of HASPs "by a competent person." A competent person is defined as a CIH or "equivalent by training and/or experience." The preceding provision in the Manual specifies that "[e]ach NAVFACENGCOM activity shall ensure that plans are reviewed and accepted prior to issuing the Notice to Proceed." Manual, ¶ 0407.b. Because the NAVFACENGCOM is the Naval Facilities Engineering Command, and this provision is also cast in the unambiguously mandatory terms "shall ensure," this provision imposed *upon the Navy itself* a "mandatory and specific" duty to ensure that plans were reviewed and accepted. *See Terbush*, 516 F.3d at 1129. In short, read in conjunction, paragraphs 0407.b and 0407.c of the Manual required review of HASPs *by the Navy's* "competent person." No meaningful review—and certainly no meaningful review *by the Navy*—would be accomplished by having a contractor's CIH review the contractor's own HASP, particularly if the contractor's CIH is also the author of the contractor's HASP, as is the case here.

[3] This "federal . . . policy specifically prescribes a course of action for an employee to follow," review by the Navy of a contractor's HASP by a competent person, such that "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. Thus, the Manual "specifically prescribes a course of conduct," leaving nothing to the Navy's discretion. *See Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001). The provision is not so uncertain in its definition of the requisite training of the person conducting the review that it is "discretionary." Rather, the provision expressly requires review by "a certified industrial hygienist [(CIH)] *or equivalent* by training and/or experience." Manual, ¶ 0407.c. (emphasis added). This specification of "equivalence" to a CIH "by training and/or experience" is sufficiently

specific to define the requisite training of the person conducting the review. Although some professional judgment might be involved in deciding whether or not a particular person actually is the "equivalent" of a CIH by training and/or experience, that professional judgment is not the same as "discretion."

Moreover, in *Bolt v. United States*, 509 F.3d 1028 (9th Cir. 2007), this court found that a comparable policy provision was sufficiently mandatory and specific to make the "discretionary function" exception inapplicable. In *Bolt*, this court held that the Army's Snow Removal Policy was sufficiently "specific and mandatory" to avoid application of the "discretionary function" exception, where it required that snow be removed from family housing parking areas "once per year in late February or March." *Bolt*, 509 F.3d at 1032-33. This court found that this provision "expressly impose[d] a specific and mandatory duty to clear Family Housing Parking Areas of snow and ice once a year, before the end of March," so that the Army had failed its burden under the first prong of the "discretionary function" analysis. *Id.* at 1033. This was so, even though the policy did not specify *how* the snow was to be removed or the training or qualifications of the person to perform the snow removal. *See also Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000). Even supposing that the Navy had some discretion in the fulfillment of its duty to review HASPs, it had no discretion under the policy expressed in the Manual about whether or not to review the HASP *at all* and no discretion for such a review to be performed by anyone other than *a Navy* CIH or other competent person.

**[4]** Therefore, upon *de novo* review, we hold that the district court erred in determining that the Navy had met its burden on the first prong of the "discretionary function" analysis, because the Manual did impose "mandatory and specific" requirements for review by the Navy of the contractor's HASP. *Terbush*, 516 F.3d at 1129.[4] Because the Manual

---

[4]The Navy argues that the evidence at trial showed that it adhered to this requirement, but the Navy has not cited, and this court has not found,

directed mandatory and specific action, "the inquiry comes to an end because there can be no element of discretion when an employee 'has no rightful option but to adhere to the directive,' " and the "discretionary function" exception is inapplicable. *Id.* (quoting *Berkovitz*, 486 U.S. at 536).[5]

*ii. FFA provisions*. Myers also argues that the FFA included mandatory and specific provisions regarding the Navy's obligation to ensure that safety procedures were followed. Specifically, she relies on the provision of the FFA requiring the Navy to designate a QAO to oversee field work and to ensure compliance with work plans and sampling plans. FFA, ¶ 20.1. The Navy contends that this provision did not specifically describe how the QAO was to ensure compliance with work or safety plans, nor did it remove discretion to delegate certain functions to the contractor. The district court did address this dispute, at least in its 2004 ruling on the Navy's motion to dismiss: The district court held that the FFA did not create any mandatory duty, because it did not specify how the Navy would carry out its duty to supervise. In its ruling on the first phase of the bench trial, the district court did not specifically address the FFA provisions at issue. The district court did conclude, however, that "the evidence showed that Defendant made policy-based decisions regarding discretionary questions of whether to do the remediation work at all, and whether to do the work itself—or select a contractor."

---

any authority suggesting that whether or not the Navy adhered to the requirement is relevant to whether or not the "discretionary function" exception applies.

[5]The dissent takes the position that we must remand for the district court to resolve factual issues before a legal ruling can be made on whether the Navy's Manual provisions imposed a mandatory duty on the government. In our view, whether or not the Navy's Manual provisions imposed a mandatory duty on the government is not primarily a factual inquiry, but a legal one, subject to *de novo* review.

**[5]** The FFA provision at issue, like the Manual provision discussed above, uses mandatory language: The QAO "*will ensure* that all work is performed in accordance with approved work plans, sampling plans and QAPPS" and "*shall maintain* for inspection a log of quality assurance field activities and provide a copy to the Parties upon request." FFA, ¶ 20.1 (emphasis added). Again, these provisions "specifically prescribe[ ] a course of action for an employee [the QAO] to follow," such that "the employee [the QAO] has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. Unlike the provisions of the Manual discussed above, however, the first provision, at least, does not "indicate what the [Navy] must do to comply" with the QAO's duty to "ensure" that all work is performed in accordance with work and sampling plans. Thus, it does leave that aspect to the government's discretion. The second provision, which undisputably requires that the QAO "maintain" a log, also is not sufficiently specific as to what must be logged as a "quality assurance field activity."

**[6]** We affirm the district court's conclusion that the cited provisions of the FFA are "discretionary." Thus, at least as to the FFA provisions upon which Myers relies, the court must proceed to the second prong of the "discretionary function" inquiry. *Terbush*, 516 F.3d at 1129.

### b. *Decisions based on public policy*

Even if neither the Manual provisions or the FFA provisions on which Myers relies mandates a specific course of action, that is not the end of the "discretionary function" analysis. Instead, the court must then consider, in the second prong of the "discretionary function" inquiry, whether the judgment left to the agency is of the kind that the "discretionary function" exception was designed to shield, that is, governmental actions and decisions based on considerations of public policy. *Terbush*, 516 F.3d at 1129.

The district court held that "the evidence showed that Defendant made policy-based decisions regarding discretionary questions of whether to do the remediation work at all, and whether to do the work itself—or select a contractor." The district court apparently also concluded that the Navy made policy-based decisions about requirements for experience and training of key employees of the contractor, the frequency and degree of oversight by Navy employees, and the involvement of other federal agencies.

Myers argues that, once the Navy undertook responsibility for the safety of the project, the execution of that responsibility was not subject to the "discretionary function" exception, because execution of safety standards is not susceptible to a policy analysis. The Navy argues that the government's discretionary oversight of a contractor, even of the contractor's compliance with safety standards, is immune from tort suit by virtue of the "discretionary function" exception and that the Navy never took on the responsibility of approving every step of every action of its remediation contractor, but instead relied on its contractor's expertise.

**[7]** This court must determine whether the work of remediation of contaminated soil would involve protected policy judgments. *Terbush*, 516 F.3d at 1133. Specifically, "[t]he focus of our inquiry is 'on the nature of the actions taken and on whether they are susceptible to policy analysis.' " *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)). "[I]t is therefore 'insufficient for the government to show merely that some choice was involved in the decision-making process. The balancing of policy considerations is a necessary prerequisite.' " *Bolt*, 509 F.3d at 1033 (quoting *ARA Leisure Servs. v. United States*, 831 F.2d 193, 194 (9th Cir. 1987), with alterations and internal quotation marks omitted by the *Bolt* court). As explained in *Terbush*, "[t]he decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. . . ." *Terbush*, 516 F.3d at 1133 (internal quota-

tion marks omitted). There is a recognized exception: "The implementation of a government policy *is* shielded where the implementation itself implicates policy concerns, such as where government officials must consider competing fire-fighter safety and public safety considerations in deciding how to fight a forest fire." *Id.* (internal quotation marks omitted). This case falls within the general rule, not the exception.

The district court's conclusion that the Navy's decision about whether or not to pursue the remediation project at all was a discretionary one informed by public policy considerations misses the point, even if it were correct, where Camp Pendelton was on the EPA's "National Priorities List" of sites *requiring* environmental cleanup. Because "[t]he focus of our inquiry is on the nature of the actions taken and on whether they are susceptible to policy analysis," *id.* at 1133 (internal quotation marks omitted), we look at the nature of the actions in conducting the remediation project, not the decision to undertake the remediation project.

**[8]** With the focus properly on the conduct of the remediation project, it is well to remember that "matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy." *Whisnant*, 400 F.3d at 1181; *Bear Medicine*, 241 F.3d 1214. More specifically, this court has held that "implementation" of a course of action is not a discretionary function. *Id.* Thus, while the Navy contends that its determinations about how much safety oversight was required were susceptible to policy considerations, those determinations properly fell within the scope of professional judgments about implementation of the safety plan that were *not* susceptible to public policy considerations.

**[9]** This case is similar in all important respects to *Bear Medicine*. What is at issue here, as in *Bear Medicine*, is not just a general statutory obligation to promote safety, but "a failure to effectuate policy choices already made" that are not

protected under the discretionary function exception. *See Bear Medicine*, 241 F.3d at 1215 (quoting *Camozzi v. Roland/Miller and Hope Consulting Group*, 866 F.2d 287, 290 (9th Cir. 1989)). Even if the Navy did have discretion in its monitoring of IT/OHM's actions, the Navy's actions in carrying out its responsibilities were not protected policy judgments. *Id.* In other words, "once the [Navy] ha[d] undertaken responsibility for the safety of [the OU-3] project, the execution of that responsibility [wa]s not subject to the discretionary function exception," and "[t]he decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not." *Id.* Like the government's argument in *Bear Medicine*, the Navy's argument here " 'would essentially allow the Government to 'administratively immunize itself from tort liability under applicable state law as a matter of "policy."' " *Id.* (quoting *McGarry v. United States*, 549 F.2d 587, 591 (9th Cir. 1976)).

[10] The Navy's attempts to distinguish *Bear Medicine* are unavailing. First, the Navy asserts that *Bear Medicine* is distinguishable, because the agency in that case retained for itself the responsibility to regularly inspect the work (the logging) to ensure adherence to basic safety practices, but the Navy did not do so here. This assertion is simply wrong, and any such finding is clearly erroneous, because it is without "support in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262 (citations and internal quotation marks omitted). The Manual retained the Navy's responsibility to review HASPs, and the FFA required the Navy's QAO to ensure that all work was performed in accordance with approved work and sampling plans and to maintain for inspection a log of quality assurance field activities. Thus, in this case, as in *Bear Medicine*, the Navy was required to ensure that the contractor complied with the safety provisions of the contract. *Bear Medicine*, 241 F.3d at 1217. Like the BIA's failure in *Bear Medicine*, the Navy's failure to have IT/OHM's HASP reviewed by the Navy's own CIH or other competent person and the failure of the Navy's QAO to

inspect any air monitoring were not policy judgments that Congress intended to protect from FTCA liability. *Id.*

The Navy also contends that *Bear Medicine* is distinguishable, because here, unlike the BIA in that case, the Navy presented evidence that policy factors influenced its conduct, including the efficient allocation of agency resources and the need to rely on the contractor's expertise, because the Navy was not the organization with the required expertise. That argument is also unavailing, however. This court in *Bear Medicine* in fact rejected a contention that "limited resources" was a policy-based excuse for failure to adhere to accepted professional standards, *id*. at 1216-17, and it is no better as a policy-based excuse for failure to adhere to policy manual and contractual requirements.

Thus, the Navy has also failed to carry its burden on the second prong of the "discretionary function" analysis.

### 4. Summary

**[11]** Upon *de novo* review, we find that the Navy failed to establish either prong of the "discretionary function" exception. Therefore, we reverse the district court's determinations that Myers's FTCA claim against the Navy is barred by the "discretionary function" exception and that the court lacked subject matter jurisdiction over that claim.

### B. Reasonableness Of The Navy's Conduct

Because we hold that Myers's FTCA claims are not barred by the "discretionary function" exception, we must also consider whether the district court erred in holding that the Navy acted "reasonably." Again, we reverse.

We review the district court's decision as to the reasonableness of the Navy's conduct for clear error. *Hinkson*, 585 F.3d

at 1262.[6] "The government can be sued 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' " *Terbush*, 516 F.3d at 1128-29 (quoting 28 U.S.C. § 1346(b)(1)). California law is applicable to Myers's claim against the Navy, as California is "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

**[12]** In FTCA cases, we have recognized that California's "peculiar risk" doctrine, described in Restatement (Second) of Torts §§ 413 and 416, is an exception to the general rule that a principal is not liable for torts committed by an independent contractor. *Yanez v. United States*, 63 F.3d 870, 872 (9th Cir. 1995). "[S]ection 416 liability has been construed as creating direct liability for the government's nondelegable duty to ensure that the contractor employs proper safety procedures." *Id.* at 873 n.1. Thus, "under California's nondelegable duty doctrine, the United States is directly liable for its own negligence when it fails to ensure that an independent contractor

---

[6]Myers asserts that the district court's decision is not entitled to "clearly erroneous" review, as provided in Rule 52(a)(6) of the Federal Rules of Civil Procedure, because the district court failed to find facts "specially," on various key factual disputes, as required by Rule 52(a)(1). The requirement to find facts "specially" when the action is tried without a jury or with an advisory jury is undoubtedly to facilitate appellate review. *See Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002). Even so, Myers has cited no authority for the proposition that the "clearly erroneous" standard of Rule 52(a)(6) is inapplicable if the requirements of Rule 52(a)(1) are not met. At best, the authority she cites, *Gardner v. United States*, 780 F.2d 835, 838 (9th Cir. 1986), stands for the proposition that the appropriate remedy for such a failing is to remand the case for amplification of the district court's findings. We conclude that, if the trial court apparently ignored relevant evidence or failed to make necessary factual findings, then this court can find that "the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.' " *Hinkson*, 585 F.3d at 1262. In such circumstances, remand for amplification of the trial court's findings would not be necessary.

takes adequate safety precautions and the work to be performed involves special dangers." *Gardner v. United States*, 780 F.2d 835, 838 (9th Cir. 1986); *McGarry v. United States*, 549 F.2d 587, 590 (9th Cir. 1976), *cert. denied*, 434 U.S. 922 (1977); *Thorne v. United States*, 479 F.2d 804, 808-09 (9th Cir. 1973). This nondelegable duty is one of "reasonable care." Restatement (Second) of Torts §§ 413 and 416.[7]

The district court stated, "Under California law, the foreseeability of harm and thus the necessary safety precautions to prevent the foreseeable harm is key to understanding Defendant's duty." The district court cited no authority for this "key" proposition, however. The district court found that the risk that Myers or anyone else would be exposed to thallium from the landfill project was not foreseeable.

The California Supreme Court has defined "peculiar risk" as a risk "that is peculiar to the work to be done, arising either from the nature or the location of the work and against which a reasonable person would recognize the necessity of taking special precautions." *Privette v. Superior Court*, 5 Cal. 4th 689, 695 (1993) (internal quotation marks omitted). Indeed, "[i]t is the foreseeability of that special risk which justifies the imposition of liability." *Holman v. State of California*, 124 Cal. Rptr. 773, 781 (1975).

The district court was correct that "foreseeability" figures in both the determination of the alleged tortfeasor's duty and whether the tortfeasor breached that duty, that is, acted unreasonably. California courts have explained the distinction between "foreseeability" in the "duty" context and "foreseeability" in the "breach" context, as follows: "[W]hile foreseea-

---

[7]This duty does not survive as to a contractor's employees, but does survive as to others, such as neighboring property owners or innocent bystanders, after the decision in *Privette v. Superior Court*, 5 Cal. 4th 689, 21 Cal. Rptr. 2d 72, 854 P.2d 721 (1993). *See Toland v. Sunland Housing Group, Inc.*, 18 Cal. 4th 253 (1998).

bility with respect to duty is determined by focusing on the general character of the event and inquiring whether such event is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct, foreseeability in evaluating negligence and causation requires a more focused, fact-specific inquiry that takes into account a particular plaintiff's injuries and the particular defendant's conduct." *Laabs v. S. Cal. Edison Co.*, 175 Cal. Rptr. 241, 251-52 (2009) (internal citations omitted).

**[13]** Here, prior to the bench trial, in response to Myers's motion in limine, the Navy had already conceded that the OU-3 project involved "peculiar risk." Thus, "foreseeability" in the context of a determination of "duty" was no longer an issue.[8] On the other hand, because the first phase of the bench trial was to determine whether the Navy breached its duty, it was appropriate for the district court to consider the "fact-specific" aspect of "foreseeability," which "takes into account a particular plaintiff's injuries and the particular defendant's conduct." *Id.*

**[14]** The district court's clear error here, in the context of "breach of duty," was in relying on what it perceived to be a lack of proof of causation as determinative of the foreseeability of Myers's injuries. The district court determined that it was not foreseeable that Myers would be exposed to thallium from the OU-3 project. This conclusion was based on its finding that there was no showing that thallium somehow migrated to Myers's yard or school, because tests purportedly showed an "absence" of thallium in her home, her school, and

---

[8]Myers notes that, notwithstanding the Navy's concession, the district court stated in its Decision after the first phase of the bench trial that "the excavation, transportation, and deposition of soils contaminated with hazardous substances such as lead, manganese, or thallium is not necessarily an inherently dangerous activity." Notwithstanding this observation, the district court assumed that the project involved inherently dangerous work, so that the district court did not clearly err by failing to apply the "peculiar risk" doctrine.

her parents' bodies. The district court also relied on its finding that Myers had not shown that any thallium that harmed her came from the Navy's Box Canyon operations, because experts purportedly doubted that thallium could be transported in fugitive dust, and there had been only minimal levels of thallium in the contaminated soil to start with. The proper question in the "foreseeability" inquiry for purposes of determining whether the Navy breached its duty, however, was not whether Myers *was* exposed to thallium from the OU-3 project—a "causation" question that was properly reserved for a later phase of the trial, and on which Myers had not been fully heard at the time that the district court made its findings —but whether it was foreseeable that a person exposed to thallium would suffer the kinds of injury that Myers suffered. *Id.* ("foreseeability" in the context of "breach of duty" "takes into account a particular plaintiff's injuries"). Thus, the district court clearly erred by applying the wrong legal standard in its determination of "foreseeability." *Hinkson*, 585 F.3d at 1262.[9]

The district court also found that it was not foreseeable that thallium would become windborne in fugitive dust or that dangerous levels of thallium would be present in migrating dust, because of the low concentration of thallium in the contaminated soil in the first place, so that there was "no [foreseeable] danger to be prevented." Even if this "foreseeability" finding involved application of the correct legal standard, it was implausible and without support in inferences that may

---

[9]The district court's finding that thallium was "absent" from Myers's environment and its conclusion that, consequently, she had failed to show "causation," was at best premature, when "causation" was an issue reserved for a later phase of the bench trial and an issue on which Myers had not been fully heard, and was at worst "without support in inferences that may be drawn from the facts in the record," *Hinkson*, 585 F.3d at 1262, where it mischaracterizes the test results. Some of the test results did show thallium, and the parties disputed whether or not those results were within the error tolerance of the tests or the result of proper or improper interpretation of raw results.

be drawn from the facts in the record, in light of evidence of the extreme toxicity of thallium and the provisions of the FFA and ROD establishing safety precautions, including dust suppression measures, to prevent exposure to "nearby receptors." *See* ROD ¶ 2.5.8.1.

The Navy's argument that this provision of the ROD was not applicable to the 1999 soil removal and dumping project, but only applicable to the later "capping" project for the landfill in 2000, is illogical and implausible. It would be illogical to be concerned with dust suppression only during a capping project, but not while contaminated soil was actually being dumped into the landfill. The provision of the ROD that the Navy contends was applicable to the 1999 soil removal and dumping project, ROD ¶ 2.4.6.1, which mentions only "potential risk for workers," but not for "nearby receptors," expressly applied only to removal of contaminated soil from the five contaminated sites in OU-3, not to dumping of the contaminated soil in the landfill. *See* ROD ¶ 2.4.5.

The district court relied on its findings that the Navy took care to prevent dangerous migration of thallium by having in place adequate safety measures and ensuring that the contractor was actually taking those safety measures, including regular safety meetings and site visits, selecting an experienced remediation contractor, requiring highly qualified people at important positions, and allowing other agencies to participate in the oversight and design of safety precautions. These findings of lack of foreseeability of harm and reasonableness of the Navy's conduct, however, are clearly erroneous, in light of evidence of glaring omissions in the Navy's safety oversight for the OU-3 project, which the district court simply ignored.

First, the district court could not have found on this record that the Navy complied with the requirements in the Manual to have the HASP for the OU-3 project reviewed by a Navy CIH or equivalent person. As this court held above, the Man-

ual required review by a Navy CIH or equivalent person, not just by the contractor's CIH, and there is no evidence that either of the Navy's CIHs or any other equivalent person from the Navy ever reviewed the HASP. Indeed, Mr. Bryson, one of the Navy's CIHs, testified that, if the HASP had been reviewed by the Navy, a record of that review would exist on the computer database that Ms. Corbett maintained, but there is no such record. Certainly, the Navy has not asserted that there is any evidence demonstrating that Navy personnel reviewed the HASP. Evidence that the personnel in question did not recall reviewing the HASP and the lack of evidence that would ordinarily indicate that the Navy had reviewed the HASP lead to no logical or reasonable inference that Navy personnel did, in fact, review the HASP. Rather, the only reasonable inference from such evidence and the lack of any other evidence that one or both of the Navy's CIHs reviewed the HASP is that the HASP was never reviewed. Violation of the mandatory duty to review the HASP is plainly a breach of the duty to exercise reasonable care to ensure that the contractor took reasonable care to follow required safety precautions. Restatement (Second) of Torts § 416.

Second, there is no evidence that the Navy's QAO ever took any steps to ensure that air monitoring samples were reviewed or that work was stopped if dust thresholds were exceeded, as required by the provision of the FFA stating that the QAO must "ensure that all work is performed in accordance with approved work plans, sampling plans and QAPPS [Quality Assurance Project Plans]." FFA, ¶ 20.1. Such a failing was unreasonable, even if the Navy could delegate air monitoring and responses to excessive dust levels to the contractor. In fact, the record evidence suggests that the contractor took advantage of the lack of oversight, because the contractor never stopped work, even when its own dust detection levels were exceeded. Furthermore, Myers has pointed to evidence that the contractor's employee responsible for air monitoring was instructed *not* to stop work when "exceedences" occurred. Again, violation of the mandatory duty to

ensure adherence to the safety plans is plainly a breach of the duty to exercise reasonable care to ensure that the contractor took reasonable care to follow required safety precautions. Restatement (Second) of Torts § 416.

**[15]** The district court's finding that the Navy acted "reasonably" was clearly erroneous and is reversed. This matter must be remanded for phases two and three of the bench trial, "actual and proximate causation" and "damages," respectively.

## C.   Reassignment On Remand

**[16]** In the event that she obtains a reversal, Myers asserts that this matter should be remanded for further proceedings before a different judge, pursuant to 28 U.S.C. § 2106. The Navy did not address this issue in its briefing. We decline the invitation to reassign the case to a different judge on remand.

The factors that we consider to determine whether reassignment is appropriate are the following:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously [ ] expressed views or findings determined to be erroneous based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1133 (9th Cir. 2008) (quoting *Sears*, 785 F.3d at 779). We may direct reassignment of the case, even if we do not question the impartiality of the judge, in light of unusual factors indicating that a reassignment is advisable to preserve the appearance of

justice. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 373 (9th Cir. 2005)

Here, there is no real reason to question the impartiality of the trial judge, notwithstanding what we have found were numerous errors in his disposition of the case. Nor are we convinced that the errors we find are such that the trial judge would have substantial difficulty in putting out of his mind his previous findings. We are troubled by the undue—and unexplained—three-year delay between the conclusion of the first phase of the bench trial and the issuance of an opinion. We are not convinced, however, that this is of such gravity as to warrant reassignment of the case to preserve the appearance of justice.

We conclude that it is not necessary to direct that this case be reassigned to another judge upon remand. Nevertheless, we trust that proceedings on remand will proceed expeditiously.

### III.   CONCLUSION

Because the district court erred in holding that the "discretionary function" exception barred the Navy's liability on and the court's subject matter jurisdiction over Myers's claim, and clearly erred in finding that the Navy acted "reasonably" and not in breach of its duty in conducting the remediation of contaminated soil in the project at issue here, we reverse and remand this action for further proceedings. Nevertheless, we find it unnecessary to reassign the case to a different judge on remand.

REVERSED AND REMANDED.

---

RAWLINSON, Circuit Judge, concurring in part, and dissenting in part:

My most fundamental objection to the majority opinion is that the facts set forth in the opinion bear little resemblance

to the findings of fact made by the district court following a bench trial. Rather than adopting the findings of fact made by the district court, as we are mandated to do absent a showing of clear error, *see Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002), the majority completely rewrites the facts to such an extent that it decides a different case on different facts than that decided by the district court. Our precedent is to the contrary—the clear error standard of review "is significantly deferential, and we will accept the lower court's findings of fact unless we are left with a definite and firm conviction that a mistake has been committed." *Lentini v. California Center for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004) (citation and internal quotation marks omitted).

A few examples will illustrate my point:

- The district court found that at Site 1A, 154 soil samples were taken and only one sample exceeded the safe standard for thallium. Similarly, of the 99 soil samples taken from Site 2A, only two exceeded the safe standard for thallium. The district court found that two of the exceedences were slight and one appeared to be due to an unreliable test result. The district court specifically found that lead was of greater prevalence "and was considered to be the primary risk to health." District Court Opinion, p. 4.

    ***The majority opinion translates the district court's finding into a histrionic description of the poisonous nature of thallium and a reference to the Navy's Record of Decision (ROD) to disregard the district court's finding. Majority Opinion, pp. 9605-06 and n.2. This approach is the antithesis of our charge. Indeed, if there is "support in inferences that may be drawn from facts in the record," the district court's finding cannot be clearly erroneous. USAA Federal Savings Bank v. Thacker (In***

*Re Taylor), 599 F.3d 880, 888 (9th Cir. 2010). The district court was not required to parrot the ROD or any other document or testimony that was part of the evidence presented. Rather, the district court, after considering all the evidence, made its findings. The district court specifically relied on evidence that "[s]ampling data revealed few concentrations of thallium at very low levels." District Court Opinion, p. 4. That finding was supported by the testimony of the industrial hygienist assigned to the project by the contractor.*

- The district court found that the air monitors used by the contractor "were appropriate for the task." District Court Opinion, p. 7.

*The majority opinion makes what can only be characterized as an inappropriate contrary finding that "the air monitoring device specified did not monitor 'total dust' but only dust particles smaller than a certain size." Majority Opinion, pp. 9607-08. However, the majority's finding on appeal is contrary to the explicit testimony of the assigned industrial hygienist that total dust was measured. The district court acted completely within its discretion as the factfinder to credit this testimony rather than the testimony offered on behalf of the Plaintiffs.*

- The district court found that the contractor's industrial hygienist "had on-site responsibility and authority to stop work if working conditions presented a risk to health and safety." District Court Opinion, p. 4.

*The majority opinion concludes that because neither of the Navy's industrial hygienists reviewed the health and safety plan, the Navy failed to meet its obligations under the governing agreement. See*

*Majority Opinion, p. 9608. However, nothing in the governing agreement required the industrial hygienist to be a Navy employee.*

• The district court found that:

> [t]he Defendant never received any com-
> plaints in 1999 from residents of the adja-
> cent housing complex or the elementary
> school about blowing dust from Box Can-
> yon. Of the various health and safety offi-
> cials that routinely visited the site, none
> observed conditions causing concerns. A
> teacher at the elementary school testified
> that her classroom faced the landfill. Daily,
> the teacher was in a position to notice
> whether dust was spreading towards either
> the school grounds or farther to the school
> buildings. The school teacher testified that
> over the life of the Box Canyon project, she
> observed dust coming over the fence onto
> the school grounds on only two or three
> occasions, and that each time the dust came
> over the perimeter fence, it did not
> approach the school . . .

District Court Opinion, p. 7.

The district court credited the Navy's proffered testi-
mony regarding the measures taken to prevent dust
on the site, and specifically credited the testimony of
the assigned industrial hygienist in finding that
"[a]ny visible dust was likely from uncontaminated
soil." *Id*. The district court acknowledged that "there
were occasions where the action level for airborne
dust was exceeded . . ." *Id*., pp. 7-8. However, the
district court attributed that to the fact that the "ac-
tion level" set by the contractor was so low that there

were exceedences where there was no visible dust."
*Id.*, p. 8.

*The majority's version reads:*

*"The district court found that there were 'occasions' in the course of the project when the air monitoring equipment registered dust levels in excess of the levels that were supposed to require work stoppages (called "exceedences" by the parties) but did not note that record evidence showed that such exceedences occurred more than two hundred times. . . . It is undisputed that the work was never stopped because of these exceedences. . . .[T]he Navy's QAO for the project, Nars Ancog, never looked at the air monitoring data collected by [the contractor] nor did anyone else from the Navy. Residents in the nearby Wire Mountain Family Housing area testified that, at times during the remediation project in 1999, visible clouds of dust blew from the landfill . . ." Majority Opinion, p. 9608.*

This unmitigated and unauthorized appellate factfinding flies directly in the face of testimony from the assigned hygienist that the exceedences required work stoppage only if the dust could not be controlled. The district court's acceptance of that testimony was completely consistent with its factfinding function.

- As to the Plaintiff's specific allegations, the district court found that tests conducted in 2000 at Box Canyon, and at the adjacent housing complex and school revealed "no elevated levels of thallium." Soil samples from Plaintiff's residence and "swipe samples" from inside the residence contained no thallium. The district court noted that there was "mixed testimony" about the

results of the urine samples, but found that the evidence failed to connect any exposure to "the Government's negligence in employing and supervising its contractor." District Court Opinion, p. 8.

***The majority opinion contrasts the following "assertions" by the Navy and "contentions" by the Plaintiffs: 1) the samples were taken months after the project and following a windy, rainy winter; 2) the Navy's report was inconsistent with the raw data; and 3) Plaintiffs' expert's opinion was that thallium was present in Plaintiffs' residence and adjacent homes. Majority Opinion, p. 9609-10.***

The existence of counter assertions and contentions between the parties invokes the quintessential factfinding function of a trial judge, which we review for clear error. *See Zivkovic*, 302 F.3d at 1088. Rather than doing so, the majority completely disregards the district court's findings, conducts a retrial on appeal and finds for the Plaintiffs on the bases that the discretionary function exception did not apply and that the Navy acted unreasonably during the project. I disagree on both counts.

### 1. *The Discretionary Function Exception*

#### a. *The Manual Provisions*

The majority opinion's analysis falters with its acknowledgment that the district court failed to make findings regarding whether the provision in the Manual was mandatory or whether it required review of the safety plans by Navy personnel. *See* Majority Opinion, p. 9614. Following a bench trial, if the findings are inadequate on a contested issue, it is our obligation to remand the issue to the district court to resolve the factual dispute. *See Zivkovic*, 302 F.3d at 1090-91. Rather than adhering to this basic precept of appellate review,

the majority opinion completely usurps the function of the district court. *See Fisher v. Roe*, 263 F.3d 906, 912 (9th Cir. 2001), *abrogated on other grounds in Mancuso v. Olivarez*, 292 F.3d 939, 944 n.1 (9th Cir. 2002) ("This case graphically illustrates one of the bread and butter principles of appellate review that governs the manner in which we measure the work of a trial court. Trial courts find facts. We do not.")

The majority professes to make a legal conclusion that the Safety and Health Program Manual required review of the health and safety plan by a Navy hygienist. *See* Majority Opinion, p. 9616 n.5. However, in truth no provision of the manual mandates use of a Navy hygienist. And the district court judge credited express testimony from the author of the Manual that there was never any intent to utilize a Navy hygienist. Once again, the majority completely usurps the factfinding function of the trial judge, disregards the evidence and retries the case.

Because I would remand for the district court to resolve the factual issue that must be resolved before a legal ruling can be made, I dissent from the majority's conclusion that the Navy Manual provisions imposed a mandatory duty on the government.

### b. *The Federal Facility Agreement Provisions*

The majority opinion concludes, and I agree, that the provisions in the agreement were not sufficiently specific to render them mandatory requirements. *See* Majority Opinion, p. 9617. The majority then proceeds to consider whether the discretion conferred upon the Navy was based on considerations of public policy. *See id.*, p. 9617, citing *Terbush v.United States*, 516 F.3d 1125, 1129 (9th Cir. 2008).

In *Terbush*, we recognized a clear distinction between decisions involving routine maintenance, that do not involve pol-

icy considerations and more extensive undertakings that do implicate policy considerations. *See id.* at 1133-34.

We cited as examples of routine maintenance snow removal and removing mold from a commissary meat department. *See id.* In contrast, we observed that "repairing [a] roadside wall involved balancing several policy considerations." *Id.* at 1134.

The majority opinion concludes that the outcome of this case is dictated by *Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001). *See* Majority Opinion, pp. 9619-20. However, the majority's conclusion is irretrievably tainted by the impermissible factfinding reflected in its statement of facts. To support its conclusion, the majority opinion relies on "the Navy's failure to have [the contractor's health and safety plan] reviewed by the Navy's own [industrial hygienist] or other competent person and the failure of the Navy's [Quality Assurance Officer] to inspect any air monitoring . . ." Majority Opinion, p. 9620-21. However, as the majority previously noted, the district court made no findings regarding whether the Navy Manual required use of a Navy hygienist or whether use of the contractor's hygienist would satisfy the requirement. Rather than acknowledging that the lack of findings precludes appellate review, and remanding for appropriate findings, the majority engages in appellate factfinding to conclude that the Navy failed to meet its obligations to review the contractor's health and safety plan. *See* Majority Opinion, pp. 9615-16. I cannot co-sign this blatant departure from the confines of appropriate appellate review.

### 2. *Reasonableness of the Navy's Conduct*[1]

[1]I also disagree profoundly with the majority's discussion of foreseeability. However, I will not unnecessarily lengthen my dissent by detailing my different view on this point because the majority's wholesale disregard of the district court's factual findings (and lack of findings where applicable) sufficiently call into question the analysis employed by the majority.

As an initial matter, the majority concludes that failure by the district court to make adequate findings on this issue would support a finding of clear error. *See* Majority Opinion, p. 9622 n.6. Although the majority cites *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) to support this conclusion, *Hinkson* says no such thing. Rather, *Hinkson* reiterates that on appeal the factual findings of the district court are reviewed. *See id.* at 1263 ("[W]e look to whether the trial court's resolution . . . resulted from a *factual finding* that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record."). This test presupposes the existence of reviewable factual findings. In the absence of adequate factual findings, *Zivkovic* instructs us to remand to the district court.

Having cleared the way by misplaced reliance on *Hinkson*, the majority then unabashedly retries the case. For example, the majority opinion accuses the district court of "mischaracteriz[ing] the test results regarding the presence of thallium. Majority Opinion, pp. 9624-26. However, the record reflects that the district court credited the testimony of the Navy's experts over that of the Plaintiffs' experts. *See* District Court Opinion, p. 8. In fact, the majority concedes that there was a dispute between the parties on this point. *See* Majority Opinion, p. 9625 n.9. When a trier of fact resolves such a dispute, no clear error occurs. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citations omitted).

The other two bases supporting the majority's conclusion are similarly deficient. *See* Majority Opinion, pp. 9626-28. As previously discussed, because the majority recognizes that there were not adequate findings made regarding the industrial hygienist requirement, the matter should be remanded. The discussion regarding the air monitoring samples is simply a reiteration of the impermissible reweighing of the facts described above. In sum, the majority opinion's analysis and

final conclusions are irreversibly tainted by its failure to adhere to the fundamental precepts of appellate review. Although I agree that additional factfinding is warranted, it should be done by the district court and not by this panel.

Accordingly, I concur in that portion of the majority opinion concluding that additional factfinding is warranted. However, I would remand the case to the district court for that additional factfinding rather than direct a verdict for Plaintiffs as the majority has done. I also agree that there is no need to assign the case to a different judge on remand. For the reasons discussed, I respectfully dissent from the balance of the majority opinion.